IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HEALTH MONITORING SERVICES )
OF AMERICA, INC., a Florida )       Civil Action No. 06-0018
corporation, MEDICAL MARKETING )
CONSULTANTS, LLC, a Florida )
limited liability company, )
MARTIN PRAEGER, and MARK )
SCHERMER, )
 )
 )       Judge Donetta W. Ambrose
           Plaintiffs, )       Magistrate Judge Caiazza
 )
      v. )
 )
 )
CARDIAC TELECOM CORPORATION, )
a Pennsylvania Corporation, )
and LEE EHRLICHMAN, )
 )
 )
 )
           Defendants. )

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

The Plaintiffs in these related cases[1] have filed a Motion
to Enforce Settlement Agreement (Doc. 14) allegedly reached by
all parties as to all issues in both cases in August 2006.
Following review of the parties' submissions and an evidentiary
hearing, the court finds that although an agreement was reached,
a condition precedent to its enforcement was not met. As a

---

[1]The second case, captioned Medical Marketing Consultants, LLC v.
Cardiac Telecom Corp., Civil Action No. 06-0274, is pending. Because
the settlement agreement addressed in this Report and Recommendation
would, had it been enforceable, have resolved the issues presented in
the second case as well, the court, with the consent of the parties,
deferred ruling on the request for preliminary injunctive relief filed
in the related matter. The court concludes that the settlement
agreement is not enforceable. Consequently, the request for injunctive
relief extant in 06-0274 is addressed in a separate Report and
Recommendation filed concurrently with this one.

result, the court recommends that the Motion be denied.

## II. <u>REPORT</u>

### A. <u>Historical Facts</u>

This Motion has its genesis in disputes arising in connection with October 28, 2004 contracts incident to the sale of business assets. When these contracts were executed, Health Monitoring Services of America ("HMSA"), a Florida corporation whose principals were Martin Praeger("Praeger") and Mark Schermer ("Schermer"), was engaged in selling cardiac monitoring equipment and services that allowed patients to remain at home during the testing process. HMSA made these cardiac and other non-invasive diagnostic tests available to doctors and hospitals nationwide, marketing its products and services though independent sales representatives.

Cardiac Telecom Corporation("CTC"), a Pennsylvania corporation, was a competitor in the home health monitoring industry. The centerpiece of its operation was the sale and servicing of home-based cardiac arrhythmia detection and alarm systems.

CTC's President and CEO, Lee Ehrlichman, was aware of HMSA's success in the field of remote cardiac monitoring and became convinced that HMSA services and equipment would mesh well with and allow CTC to expand its home healthcare market. HMSA and its principals agreed that this transfer of assets would benefit them as well.

In anticipation of the transaction, Praeger and Schermer formed a limited partnership, Medical Marketing Consultants, LLP ("MMC"), which was organized solely to assist CTC in marketing its expanded line of services and equipment. In order to carry out this marketing effort, MMC employed and entered into broker agreements with an experienced sales staff who had, until the transfer, sold on behalf of HMSA. These broker agreements contained provisions precluding the sales representatives from competing with MMC during the two year duration of the agreements and for an additional two years thereafter.

In October 2004, the two primary contracts underlying these cases were signed. The first, an Asset Purchase Agreement ("Purchase Agreement"), was made between HMSA, Praeger and Schermer, the sellers, and CTC, the buyer. This agreement covered cardiac monitoring equipment, computer software, and physician and group accounts formerly served by HMSA. It excluded accounts receivable. Aside from account collection efforts, HMSA was to cease doing business after the asset transfer.

CTC's primary obligations under the Purchase Agreement can be summarized as follows: 1)CTC was to pay Praeger and Schermer $1,000,000. for physical equipment included in the sale; 2) CTC would pay MMC a percentage of the monthly sales revenue generated from sales to accounts transferred from HMSA, new accounts secured by the MMC sales force, and a small portion of CTC's telemetry business. These "earn out payments" were to continue for six years from the date of the Purchase Agreement or until

3

total payments equaled or exceeded $10,548,000.[2] Under the terms of a Sales Agreement executed the same day as the Purchase Agreement: 1) CTC was granted the right to use MMC's sales representatives to market CTC's entire line of products and services; 2) the sales representatives remained MMC employees; 3) MMC paid the sales commissions, and retained a percentage of the sales generated by its sales staff; and 4) CTC was not permitted to use MMC sales representatives without MMC's permission, because each of the representatives had signed a broker agreement with MMC covenanting not to sell the products of a competitor. The Sales Agreement also contained a provision barring MMC or CTC from soliciting or hiring the other's employees.

Less than a year after execution of the agreements relating to the transfer of assets, the business relationship among the parties deteriorated precipitously. The parties offer different explanations. MMC blames CTC's lack of familiarity with the products and services transferred, poor management of the sales force, and inadequate quality and service standards. MMC contends that it was unable to pay its sales representatives because CTC did not make payments to MMC.

---

[2] Under an Equity Participation Agreement also executed at the time of the Purchase Agreement, CTC was to transfer shares of its business to MMC at certain revenue milestones. CTC, HMSA, Praeger, Schermer, and MMC also entered into a Security Agreement. As security for its obligations, CTC granted MMC a lien and security interest in the physical equipment and agreed to keep the secured assets free from any other encumbrance. A defined portion of CTC revenue was to be placed in a secured bank account. In the event of a default, MMC had the right to demand that its signature be required for all withdrawals and disbursements from this account.

CTC, on the other hand, argues that the business debacle is traceable to questionable business and billing practices employed by HMSA and its principals prior to and after execution of the asset transfer.  As a result of these practices, former HMSA clients were dunned by insurance companies, questioned about bills, and required to return reimbursements received. Health care providers, associating CTC and its sales representatives with past and ongoing HMSA-related difficulties, no longer wanted to do business with CTC. The problem was exacerbated when former HMSA clients learned that HMSA had ceased doing business, and believed that CTC, too, was defunct. CTC contends that HMSA's business practices tainted CTC's operation, grossly diminishing the value of the assets purchased and impairing recovery efforts. In order to protect its assets from becoming utterly worthless, CTC contends that it was necessary to deal directly with MMC sales representatives; CTC had no choice but to pay the sales force itself and to contract directly with some of the representatives.

The Plaintiffs sent letters to the Defendants in July and December 2005, declaring that CTC had defaulted on its contractual obligations by failing to make required earn out payments, placing additional encumbrances on equipment and secured bank funds, denying MMC's signature rights in the secured account, and attempting to divert MMC's only asset - its sales representatives. MMC argued that CTC received what it had bargained for without paying. CTC contended that what it had

bargained for was worthless. Impasse was inevitable.

## B. **Procedural History**

On January 6, 2006, HMSA, Praeger, and Schermer filed suit in Civil Action No. 0018 against CTC and Ehrlichman. In an amended complaint they allege breach of the Purchase Agreement by CTC (Count I); breach of the Security Agreement by CTC (Count II); as an alternative to Count I, conversion of property conveyed to CTC under the terms of the Purchase Agreement(Count III); and  tortious interference by Ehrlichman and CTC with the broker agreements made between MMC and its sales representatives (Count IV).[3] On January 18, MMC also initiated arbitration proceedings against CTC with the American Health Lawyers Association.

On February 7, 2006, MMC filed a second related civil suit, Civil Action No. 06-0274, against CTC and Ehrlichman for specific performance of the anti-solicitation provision of the Sales Agreement as well as a request for preliminary and permanent injunctive relief against CTC and Ehrlichman (Count I). MMC also sought injunctive relief against CTC based on other violations of the Sales Agreement, including diversion of sales fees, failure to provide sales data, failure to honor MMC's signature rights, and failure to provide security for the sales fees (Count II). In Count III of the complaint, MMC sought injunctive relief and

---

[3]The Defendants' Motion to Dismiss Count IV of the amended complaint is pending in this matter, and will be addressed in a separate Report and Recommendation

damages for the Defendants' tortious interference with broker agreements made between MMC and its sales personnel. Last, in Count IV, MMC sought injunctive relief and damages based on Ehrlichman's alleged tortious interference with the anti-solicitation portion of the Sales Agreement.[4] A full-day hearing on the Plaintiffs' request for preliminary injunctive relief was held on March 28, 2006.[5]

At a status conference on April 19, 2006, the court confirmed what it believed to be the dire financial circumstances facing the parties, and expressed doubt that continued litigation was practical, or even possible. If the parties could not find ground for compromise, agreeing to work together to help CTC succeed, the financial collapse of both companies seemed certain. The parties agreed, recognizing the need to rise above intense personal animosity. They asked that rulings on outstanding motions in the related cases be deferred pending the outcome of settlement discussions.

Shortly thereafter, negotiations, memorialized in a series of fourteen letters or emails, began, and continued until August 3, 2006. The Plaintiffs contend that on that date a settlement

---

[4]A Motion to Dismiss Counts III and IV of the complaint is pending in the related matter, Civ. Action No. 06-274, and will be addressed in a separate Report and Recommendation.

[5]At that hearing, the court was informed that days earlier MMC learned for the first time that CTC had sent a letter dated March 17, 2006 to MMC's defunct address purporting to terminate the Sales Representative Agreement on the basis of fraud. CTC claimed that the initial notice of termination had been included in a letter dated February 26, 2006.

agreement was made; all that remained was to reduce its terms to writing. Shortly thereafter, counsel for the Defendants, acting on behalf of all of the parties, notified the court that a settlement had been reached. Consistent with that representation, Judge Ambrose entered an Order dated August 7, 2006 that reads in part: "The court has been advised by counsel for the parties that the above-captioned action has been settled and that the only matters remaining to be completed are the payment of the settlement proceeds and the submission of a stipulation for dismissal under Fed. R. Civ. P. 41(a)." A similar Order was entered in the related case on August 9, 2007. The matters were marked "closed" with the proviso that either could be re-opened "should further proceedings become necessary or desirable."

The Plaintiffs contend that the draft of the settlement agreement received from Defendants' counsel on August 24, 2006 contained a new and material term not included in the August 3 agreement. This term was a non-compete clause prohibiting the Plaintiffs from selling, leasing, or distributing certain cardiac event monitors, or telemetry-at-home products and services anywhere in the United States for a period of five years from the date of the agreement. When the Plaintiffs objected to this provision, the Defendants proposed an alternative that required Plaintiff Praeger to divest himself of his interest in a business competing with CTC. Praeger, at least in theory, agreed to pursue this alternative.

The parties then began negotiation regarding the divestiture

8

and the date on which payments from CTC to the Plaintiffs would begin. When, as of December 2006, the parties were unable to reach a compromise, the Plaintiffs filed this Motion to Enforce Settlement Agreement according to terms established in early August 2006.

The court met with the parties on March 5, 2007, notifying them that if a settlement could not be reached by March 28, a hearing would be held on the Motion to Enforce. The court also informed the parties that if it declined to grant the Motion, it would rule promptly on the Plaintiff's request for preliminary relief in the related case. At the conclusion of a discussion held following the March 5 meeting, the parties represented that they had reached a revised settlement agreement. Counsel for the Defendants stated, without objection, that the terms of the settlement required the approval of the CTC Board of Directors. One week later, the court was notified that the Board had refused to endorse the settlement, but that the parties were continuing to negotiate. When the parties failed to reach a new agreement, the April 16, 2007 hearing on the Motion to Enforce the August agreement went forward.

## II. <u>DISCUSSION</u>

### A. <u>THE LAW</u>

"An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." <u>Max Control</u>

Systems, Inc., v. Industrial Systems, Inc., No. Civ. A. 99-CV-2175, 2001 WL 1160760 *2 (E.D. Pa. July 31, 2001)(citing Green v. John H. Lewis & Co., 436 F. 2d 389, 390 (3d Cir. 1970)). "When a district court's jurisdiction is based on diversity of citizenship and the settlement involves state law claims, state law governs the enforcement of the settlement." Id. (citing Tiernan v. Devoe, 923 F. 2d 1024, 1032 (3d Cir. 1991)).

Under Pennsylvania law, a settlement agreement is governed by principles of contract law and, to be enforced, must include all elements of a valid contract. "As with any contract, it is essential to the enforceability of a settlement agreement that 'the minds of the parties should meet upon all the terms, as well as the subject-matter of the agreement.'" Mazzaella v. Koken, 79 A.2d 531, 536 (Pa. 1999)(quoting Onyx Oils & Resins, Inc. v. Moss, 367 Pa. 416, 420 (1951)).

As long as the parties have agreed on the essential terms of a settlement, it does not matter that the settlement has not been reduced to writing, or that the parties have tried and failed multiple times to do so. Id. "'As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties.'" Commerce Bank/Pennsylvania v. First Union National Bank, 911 A. 2d 133, 145 (Pa. Super. 2006)(quoting Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999)). Where there is conflicting evidence regarding the parties' intent regarding the existence of a complete expression of their agreement, that

intent is an issue for the finder-of-fact. <u>Mazzella</u>, 79 A.2d at 536.

If all of the material elements of a settlement have been agreed upon, the agreement is enforceable. If, however, there are "ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce," the agreement will be set aside. <u>Id.</u> at 537 (quoting <u>Essner v. Shoemaker</u>, 143 A. 2d 364, 366 (1958)).

## B. <u>ENFORCEABILITY OF THE ALLEGED AGREEMENT</u>

The Plaintiffs' position is that an enforceable settlement agreement was reached when, on August 3, 2006, their counsel emailed counsel for the Defendants as follows:

> I write to confirm that, as I told you yesterday over the telephone, my clients have agreed to the settlement agreement proposed by CTC in your letter to me dated 7/31/06 (which incorporates the proposals made by CTC in its 7/3 and 7/13 letters) subject to working out the terms of our settlement. [6]

(Def. Ex. B.) It was the "working out the terms of [the] settlement" that proved problematic. When the Defendants' draft of the supposed settlement was forwarded to the Plaintiffs nearly a month after the deal was struck, it contained the non-compete clause to which the Plaintiffs objected. In this Motion - filed months after receipt of the written draft - the Plaintiffs ask that the later-added clause be excised from the agreement, and

---

[6]The context established by the correspondence shows that the "7/3" letter referenced was actually dated "7/6". The record does not contain correspondence dated "7/3".

that the settlement be enforced consistent with the terms agreed upon in early August 2006.

The Defendants argue that the disputed clause was not new or material, and was, at least implicitly, part of the August agreement. Nonetheless, they do not seek enforcement of the August agreement *or* the agreement as drafted. They argue instead that CTC's financial condition negates its ability to perform under either agreement, and that the situation is not likely to improve in the foreseeable future.

A party's after-the-fact inability to perform pursuant to the terms of an agreement is irrelevant to whether there was an agreement in the first place. In order to determine whether there was, in fact, an enforceable settlement agreement as of August 3, 2006, the court looks to the parties' manifestations of intent to be bound and the terms to which that intent extended.

The court has reviewed the record relevant to these issues, and is convinced that the parties did come to an agreement in early August 2006, and that the agreement contained the terms essential to the formation of a contract. As much as the court would like to declare this matter settled, it cannot. This is because one of these terms introduces a condition precedent, an "undetermined matter" critical to the agreement that, in the circumstances presented, "renders the agreement impossible to . . . enforce." Mazzella, 79 A.2d at 537.

On August 3, 2006, counsel for the Plaintiffs accepted the offer of settlement outlined by counsel for the Defendants in

correspondence dated July 31, 2006.  The Defendants' offer incorporated provisions proposed earlier by CTC in letters written on July 6 and July 13, 2006. Each of these earlier communications provided that any agreement reached among the parties was subject to the approval of CTC's Board of Directors. Counsel for the Plaintiffs do not contend otherwise, nor do they deny having understood that approval of the CTC Board was a condition precedent to any party's obligation to perform pursuant to that agreement; they argue only that this condition does not appear in the written "draft" agreement prepared by counsel for the Defendants and therefore should not be considered.

The court does not find the absence of this term from the draft to be dispositive on the issue of enforceability. As the Plaintiffs argue in support of their Motion to Enforce, the dispositive issue is the intent of the parties and the scope of the agreement reached on August 3, 2006. That agreement incorporated the requirement that the settlement be approved by the CTC Board; the settlement was not intended to be enforceable absent that approval.[7]  Because the agreement reached was never submitted to or approved by the CTC Board, the Plaintiffs' Motion should be denied.

---

[7]It is also significant that at the March 5, 2007 settlement conference, the parties agreed to a revised settlement that eliminated the non-compete clause at issue here, and reworked the amount of and schedule for CTC's payments to MMC. That revised settlement was submitted to and rejected by the CTC Board. The Plaintiffs, having agreed to an alternate proposal, cannot now turn back the clock and insist that the court enforce an earlier version of the agreement.

### III. __CONCLUSION__

For the reasons set out above, the court recommends that Plaintiffs' Motion to Enforce the Settlement Agreement be denied.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, Objections to this Report and Recommendation are due by June 15, 2007. Responses to Objections are due by June 25, 2007.

May 31, 2007.


_/s/ Francis X Caiazza_
Francis X. Caiazza
U.S. Magistrate Judge


cc:
All Counsel of Record
Via Electronic Mail

14